# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DARREN MALLARD # 366098**                     **CIVIL ACTION**

**versus**                                      **NO. 04-1437**

**BURL CAIN**                                   **SECTION: "J" (1)**

## REPORT AND RECOMMENDATION

   This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Darren Mallard, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On  March 15, 1996, he was convicted of possession of over four hundred grams of cocaine in violation of La.Rev.Stat.Ann. § 40:967.[2]  On October 9, 1996, he was found to be a third offender and was sentenced as such to a term of life imprisonment, without benefit of probation, parole, or suspension of sentence.[3]  On February 20, 1998, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[4]  He then filed with the Louisiana Supreme Court an application for a supervisory and/or remedial writ which was denied on October 30, 1998.[5]

On October 29, 1999, petitioner filed with the state district court an application for post-conviction relief [6] which was denied on November 16, 1999.[7]  On November 29, 1999, he filed with the state district court an amendment to his post-conviction application to add an additional

---

[2] State Rec., Vol. IV of VIII, transcript of March 15, 1996, pp. 209-10; State Rec., Vol. I of VIII, extract of minute entry dated March 15, 1996; State Rec., Vol. I of VIII, jury verdict form.

[3] State Rec., Vol. IV of VIII, transcript of October 9, 1996, pp. 18-20; State Rec., Vol. I of VIII, extract of minute entry dated October 9, 1996.

[4] State v. Mallard, No. 97-KA-0337 (La. App. 1st Cir. Feb. 20, 1998) (unpublished); State Rec., Vol. V of VIII.

[5] Mallard v. State, 723 So.2d 970 (La. 1998) (No. 98-KH-1455); State Rec., Vol. V of VIII.

[6] State Rec., Vol. V of VIII.

[7] State Rec., Vol. V of VIII, Reasons for Judgment dated November 16, 1999.

claim which was also denied on December 9, 1999.[8]  He next filed with the Louisiana First Circuit

Court of Appeal an application for supervisory writs which was denied on March 24, 2000.[9]

On July 24, 2000, petitioner filed with the state district court a motion to correct

illegal sentence which was denied on July 27, 2000.[10]  He next filed with the Louisiana First Circuit

Court of Appeal an application for a writ of review.  On February 12, 2001, that application was

denied; however, the state district court was ordered to conduct further proceedings to determine

whether petitioner was properly sentenced under the correct statute and to resentence him if

necessary.[11]  After the state district court conducted further proceedings on March 1, 2001,[12]

petitioner was resentenced on May 18, 2001, to a term of forty years imprisonment without benefit

of parole, probation, or suspension of sentence.[13]  He then filed a motion to reconsider sentence

which was denied on June 22, 2001.[14]  On May 10, 2002, the Louisiana First Circuit Court of Appeal

affirmed petitioner's conviction but amended his sentence to a term of forty years imprisonment

---

[8] State Rec., Vol. V of VIII.

[9] State *ex rel.* Mallard v. Cain, No. 99-KW-3074 (La. App. 1st Cir. Mar. 24, 2000) (unpublished); State Rec., Vol. V of VIII.

[10] State Rec., Vol. V of VIII.

[11] State *ex rel.* Mallard v. State, No. 2002-KW-1866 (La. App. 1st Cir. Feb. 12, 2001) (unpublished); State Rec., Vol. VI of VIII.

[12] State Rec., Vol. VI of VIII, transcript of March 1, 2001.

[13] State Rec., Vol. VI of VIII, transcript of May 18, 2001.

[14] State Rec., Vol. VI of VIII.

without benefit of probation or suspension of sentence and with the first thirty years without parole.[15]

On August 16, 2002, petitioner filed with the state district court another application for post-conviction relief [16] which was denied on October 9, 2002.[17] He next filed with the Louisiana First Circuit Court of Appeal an application for a supervisory writ[18] which was denied on December 30, 2002.[19] He then filed with the Louisiana Supreme Court an application for a writ of review[20] which was denied on November 21, 2003.[21]

On May 18, 2004, petitioner, through counsel, filed this federal application for *habeas corpus* relief.[22] In support of his application, he raises the following claims:

1.      There was insufficient evidence to support petitioner's habitual offender adjudication;

---

[15]  State v. Mallard, No. 2001-KA-2548 (La. App. 1st Cir. May 10, 2002) (unpublished); State Rec., Vol. VII of VIII.

[16]  State Rec., Vol. VIII of VIII.

[17]  State Rec., Vol. VIII of VIII, Order of Dismissal Without Answer dated October 9, 2002.

[18]  State Rec., Vol. VIII of VIII.

[19]  State *ex rel*. Mallard v. Cain, No. 2002-KW-2353 (La. App. 1st Cir. Dec. 30, 2002) (unpublished); State Rec., Vol. VIII of VIII.

[20]  State Rec., Vol. VIII of VIII.

[21]  State *ex rel*. Mallard v. Cain, 860 So.2d 539 (La. 2003) (No. 2003-KP-0366); State Rec., Vol. VII of VIII.

[22]  Rec. Doc. 1.

2.      The trial court improperly refused petitioner's request to
        plead guilty;

3.      The prosecution withheld impeachment evidence from the
        defense in violation of <u>Brady v. Maryland</u>, 373 U.S. 83
        (1963), and its progeny; and

4.      Petitioner received ineffective assistance of counsel at trial
        and on appeal.[23]

On July 20, 2004, the state filed a memorandum in opposition to petitioner's application, arguing that the application was untimely.[24] Petitioner, through counsel, filed a response challenging the state's argument.[25]  The state was then ordered to file a supplemental memorandum addressing petitioner's contentions regarding the timeliness of his application, the merits of his substantive claims, and any other defenses the state wished to raise.[26]  The state then filed a supplemental response again arguing that petitioner's federal application should be dismissed as untimely and, alternatively, denied on the merits.[27]

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his

---

[23]  The Court has rearranged the order of petitioner's claims for ease of analysis.

[24]  Rec. Doc. 4.

[25]  Rec. Docs. 5 and 6.

[26]  Rec. Doc. 7.

[27]  Rec. Doc. 9.

conviction or sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).

The state argues that petitioner's conviction and sentence became final when the Louisiana Supreme Court denied his writ application in case number 98-KH-1455 on October 30, 1998, and that the statute of limitations began to run from that date.[28]  This Court disagrees.

In the first place, it has long been clear that the AEDPA's statute of limitations does not begin to run from the date the Louisiana Supreme Court denies a writ application with respect to a direct appeal.  Rather, a conviction is not considered "final" for AEDPA purposes until ninety (90) days later, when the period expires for seeking a writ of certiorari from the United States Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).  Therefore, even if the state were otherwise correct in arguing that the Louisiana Supreme Court's denial was a triggering event, the state has still miscalculated the running of the statute of limitations.

However, the Court is not convinced that the Louisiana Supreme Court's denial is even the relevant triggering event.  In case number 98-KH-1455, the Louisiana Supreme Court denied petitioner's writ application challenging the intermediate appellate court's judgment affirming his conviction and life sentence.  However, petitioner is no longer incarcerated pursuant to that sentence.  Rather, because that sentence was illegal, he was resentenced on May 18, 2001, to a term of forty years imprisonment without benefit of parole, probation, or suspension of

---

[28]  Rec. Doc. 4, p. 5.

sentence.[29]  Then, on May 10, 2002, the Louisiana First Circuit Court of Appeal affirmed petitioner's

conviction but amended his sentence to a term of forty years imprisonment without benefit of

probation or suspension of sentence and with the first thirty years without parole.[30]  It is pursuant

to *that* judgment that petitioner is currently incarcerated, and, therefore, it is arguably that judgment

which is the triggering event for AEDPA purposes.[31]  Accordingly, out of an abundance of caution,

this Court finds that petitioner's one-year period for seeking federal *habeas corpus* review

commenced on June 10, 2002, upon the expiration of petitioner's period for seeking direct review

---

[29]  State Rec., Vol. VI of VIII, transcript of May 18, 2001.

[30]  State v. Mallard, No. 2001-KA-2548 (La. App. 1st Cir. May 10, 2002) (unpublished); State Rec., Vol. VII of VIII.

[31]  The Court is aware that this conclusion in not unassailable, in that it is tantamount to a "restarting" of the statute of limitations which unquestionably initially commenced on January 28, 1999, i.e. ninety (90) days after the Louisiana Supreme Court's denial of the affirmance of petitioner's conviction and sentence in the original direct appeal.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003).  The United States Fifth Circuit Court of Appeals has noted that generally the AEDPA statute of limitations cannot be restarted by collateral state court action:

> On its face, AEDPA provides for only a linear limitations period, one that starts and ends on specific dates, with only the possibility that tolling will expand the period in between.  See § 2244(d)(1), (2).  *So long as the petitioner is being held pursuant to the same state court judgment*, nothing in AEDPA allows for a properly initiated limitations period to be terminated altogether by collateral state court action.  Rather, the statutory framework only provides for the tolling of limitations during the pendency of state collateral review.  *See* § 2244(d)(2).

Salinas v. Dretke, 354 F.3d 425, 429-30 (5th Cir. 2004) (emphasis added).  However, the undersigned finds that the instant case arguably falls within the exception at which the Fifth Circuit hinted in the italicized language.  The judgment that became final by the Louisiana Supreme Court's 1998 denial, i.e. a judgment in which petitioner was sentenced to life imprisonment, is simply no longer in effect. Rather, petitioner is currently being held pursuant to the *new* state court judgment which sentenced him to a *new* term of imprisonment of forty years.  Accordingly, because the undersigned cannot say without doubt that the Salinas exception is inapplicable in this case, the recommendation is that the petition instead be dismissed on the merits, in that it is in fact unquestionably without merit.

of that judgment,[32] and expired one year later, on June 10, 2003, unless that deadline was extended through either statutory or equitable tolling.

The Court first looks to statutory tolling.  The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).

Sixty-six (66) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his post-conviction application on August 16, 2002.  Although that application was denied, tolling continues uninterrupted during the period of appellate review, so long as petitioner sought such review in a timely manner.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).  The state does not contend, and the record does not reflect, that petitioner's related writ applications were untimely filed with the intermediate appellate court or the state supreme court.  Accordingly, the Court finds that tolling continued until the Louisiana Supreme Court denied writs on November 21, 2003.[33]

At that point, petitioner had two hundred ninety-nine (299) days of his one-year statute of limitations remaining.  Because his federal application was filed one-hundred seventy-nine (179) days later on May 18, 2004, it was timely.

---

[32]  Louisiana Supreme Court Rule X, § 5(a), provides that a writ application challenging such a judgment must be filed within thirty days.  Because the thirtieth day, June 9, was a Sunday, petitioner had until the following Monday, June 10, 2002, to file his writ application in the Louisiana Supreme Court.  See La.C.Cr.P. art. 13; La.Rev.Stat.Ann. § 1:55.

[33]  State ex rel. Mallard v. Cain, 860 So.2d 539 (La. 2003) (No. 2003-KP-0366); State Rec., Vol. VII of VIII.

Because petitioner's federal application was timely filed and because the state does not contend that he failed to exhaust his state court remedies, the Court will address petitioner's claims.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On October 17, 1994, on Interstate Highway 12 in St. Tammany Parish, Louisiana, State Trooper Carl Saizan stopped a Jeep Grand Wagoneer vehicle at approximately 9:55 p.m., because its tail light was out.  Christopher Quinney, the driver of the vehicle, pulled to the side of the highway and exited the vehicle.  Quinney showed Saizan his driver's license and Saizan informed Quinney about his tail light.  Quinney pulled a bulb from his pocket and indicated that he knew the vehicle had a problem because he had recently changed the tail light bulb.  Saizan asked Quinney if he was the owner of the vehicle, and Quinney stated that he was not and indicated that he did not know who owned the vehicle.
>
> Quinney then informed Saizan that he was on his way from California to a family reunion in Mobile, Alabama, but was unable to give any specific information regarding the location of the reunion.  Although there were three passengers in the vehicle with Quinney, he indicated that he did not really know them.  He told Saizan that the name of the front seat passenger was Darren and that the girl in the back was Darren's girlfriend.  Quinney implied that they were going with him to the family reunion which was on October 27, 1994.  Saizan became suspicious because Quinney did not know who owned the vehicle and did not know the names of the people traveling with him from California to the reunion that was more than ten days away.  According to Saizan, Mobile was approximately a four-hour drive from the location of the stop.
>
> Saizan then asked Quinney to stand in front of the vehicle so he could talk to one of the passengers since Quinney did not know who owned the vehicle.  Saizan asked the front seat passenger to step out of the vehicle.  The passenger told Saizan that his name was Harold Smith, that the driver's name was Antoines, and the driver's

wife owned the vehicle.  Smith told Saizan that he was on his way from California to a family reunion in Mobile.  Smith identified the others in the vehicle as Darren and Darren's girlfriend.  Saizan then asked the male passenger from the rear seat to step out of the vehicle. The passenger told Saizan that his name was Darren Mallard, but showed him an identification card with the name Darren Franklin. He told Saizan that he used both names.  Mallard told Saizan that they were on their way to a family reunion in Birmingham, Alabama. Mallard did not know the name of the driver of the vehicle, but knew Smith and stated that the female in the vehicle was his cousin.

Saizan then spoke to Hibo Ali, the female passenger.  She also stated that she did not know who owned the car.  When he asked Ali for the vehicle's registration, she directed him to the front windshield where there was a temporary identification in the name of Karen Franklin, whom no one indicated that they knew.  Ali informed him that Mallard was her boyfriend and that she was going to Mississippi for her aunt's birthday.

According to Saizan, Quinney was calm, Smith appeared to be making up his story and had very little eye contact, Ali seemed calm, and Mallard appeared to be nervous.  At approximately 10:07 p.m., Saizan returned to his vehicle, called for backup, and ran a check on the vehicle and its occupants.  According to the information received by Saizan, the vehicle was not reported as stolen, and Quinney did not have a criminal record.   Saizan then issued a warning citation and told Quinney that he was free to leave.  Saizan then requested consent to search the vehicle.  Quinney stated that he could not give consent to search because he did not own the vehicle. Saizan explained to him that he could give consent, but Quinney refused.  Quinney told him that they had borrowed the vehicle, to take their vacation, from someone that they had met on the street in California.  Saizan indicated that the did not intend to let the vehicle out of his sight because he was very suspicious; however, he did not inform Quinney of his suspicions because he wanted him to feel that any consent to search was free and voluntary.

After asking for consent to search, Saizan returned to his vehicle and requested a canine unit.  He was informed that a unit was already on its way at Trooper Dean Behrens' request.  Behrens arrived at the scene at approximately 10:05 p.m.  Saizan returned to the suspect vehicle and told Quinney and the passengers that they were free to leave but that the vehicle would have to remain. Quinney then began acting nervous and loud; he started "ranting and raving" about how they had been accosted during their trip and that they had been searched at the border patrol checkpoint on Interstate

10.   While Quinney was having this tirade, Trooper Ernest Dykes arrived at the scene with the narcotic detector dog at approximately 10:33 p.m.   According to Saizan, when Quinney saw the dog, he became very quiet and did not say anything else.  Saizan gave Dykes a brief overview of the situation and told him that they did not have consent to search the vehicle.   The occupants of the vehicle in question exited the vehicle. Dykes walked the dog around the outside of the vehicle and the dog alerted on the left tailgate of the vehicle. The officers then opened the vehicle and the dog went immediately to the right rear quarter panel.   The contents of the vehicle were moved, the paneling was pulled away, and a large, taped package was discovered.  Saizan poked his knife into the package and pulled out a white powdery substance that appeared to be cocaine.  Behrens conducted a field test on the contents of the package and the results were positive for the presence of cocaine.

The four suspects were then arrested and transported to state police headquarters.  All four suspects were advised of the **Miranda** rights and refused to sign the waiver of rights form.  Saizan secured the package in a vault, and it was later transported to the crime lab. No one claimed ownership of the package.

Jim Churchman, a forensic scientist at the Louisiana State Police Crime Lab (LSPCL), an expert in fingerprint analysis, field retrieval of latent fingerprints, and a collector of evidence from crime scenes, received a package in connection with the instant investigation in November 1994, from the state troopers.  He lifted fingerprints from the package using a special type of photography and gave the photographs to a latent fingerprint analyst.  Churchman also weighed the contents of the package and stated that it contained a rock-like substance which weighed 292.9 grams and a powdery substance which weighed 505.9 grams.  He delivered the substance to Lisa Futrell, also a forensic scientist with the LSPCL.

Lisa Futrell, who was accepted as an expert in the field of analyzing controlled dangerous substances and forensic science, then examined the contents of the package that was brought to her by Churchman.  After performing two tests, she determined the contents of the package to be cocaine.  Carol Richard, a latent fingerprint analyst with the LSPCL, was accepted as an expert in latent fingerprint identification.   She received photographs from Churchman and compared the photographs to the latent prints of Quinney and Mallard.  She found that three prints obtained from the package in question matched Mallard's prints.  FBI Special Agent Stanley Suenage testified at trial that he saw Mallard driving the

vehicle in question in downtown Los Angeles, California, on October 11, 1994.

Quinney testified at trial that he was thirty-four years old, had never been married, and had been living in California since 1979. He had known Mallard since early 1994. Mallard told him that he was going to see some relatives in the east but he had never driven there. Quinney indicated that he had driven in that area before so they decided to take a trip together. Subsequently, Quinney, Mallard, Mallard's girlfriend, and Smith left California in the Jeep at 7:00 p.m. Mallard told Quinney that Smith was his cousin.

Quinney claimed that he thought the police lights were already flashing as he approached the police vehicle and the trooper immediately stopped him. He admitted that he told Saizan that he did not know who owned the vehicle, but claimed that he pointed out to him the registration on the vehicle's windshield. Quinney did not remember telling Saizan that they borrowed the car from someone off the street. Quinney claimed that he told the trooper that he was on his way to a family reunion on October 22nd. He claimed that Saizan did not ask him for the specific location of the reunion. He stated that the others in the vehicle were invited to the reunion but he thought they might stay in Mobile for a few days because they were having some car trouble. Quinney denied knowing that the drugs were in the vehicle and stated that the drugs were not his. Quinney claimed that he had seen two state troopers at a restaurant about forty-five minutes before the stop. Quinney's middle name is Angelo. He admitted that, although the four occupants of the vehicle had been traveling together, the only passenger he knew was Mallard. He was surprised that the other passengers told the trooper that they were going to the reunion. He also admitted being searched in Texas by a canine.

Quinney's uncle and sister testified that there was a family reunion in Mobile on October 22, 1994, at the home of Quinney's sister. Quinney had visited the home before, knew its location, and was expected at the reunion. Neither Quinney's uncle nor his sister knew the others in the car.[34]

---

[34] State v. Mallard, No. 97-KA-0337, pp. 2-6 (La. App. 1st Cir. Feb. 20, 1998) (unpublished); State Rec., Vol. V of VIII.

<u>Sufficiency of the Evidence</u>

Petitioner claims that there was insufficient evidence presented in the habitual offender proceedings to support the finding that he was a third offender.  The United States Fifth Circuit Court of Appeals has noted that claims of insufficient evidence are to be analyzed pursuant to the standard set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979):

> In considering challenges to the sufficiency of evidence in habeas proceedings, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

<u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001) (quoting <u>Jackson</u>, 443 U.S. at 319).  A sufficiency of the evidence argument presents a mixed question of law and fact.  <u>Taylor v. Day</u>, Civil Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), <u>aff'd</u>, 213 F.3d 639 (5th Cir. 2000).  Therefore, this Court must defer to the state court unless its decision regarding the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner argues that he was wrongly found to be a third offender because the state failed to prove that (1) he was represented by counsel with respect to one of the predicate convictions and (2) the other predicate conviction fell within the applicable cleansing period.  Petitioner asserted these claims in his second state post-conviction application.  In rejecting the claims, the state district court held:

> Petitioner maintains that because there was insufficient evidence to support the habitual offender adjudication, he was denied his due process rights.
> He maintains that his guilty plea in the offense of August 21, 1987 (Possession for Sale for Cocaine Base) in the State of California

- 14 -

is invalid because he appeared in proper person and the waiver of his constitutional rights was sworn from questions from the District Attorney.  The transcript indicates that the Hon. Sam Cianchetti was presiding as judge of that court, and that he states "the Court finds at this time that you've been properly advised of your constitutional rights and the consequences of your plea" (p. 7, petitioner's Exhibit A).

He also maintains that his guilty plea of December 13, 1985, to robbery is invalid since the date of discharge was not indicated by this Court.  Therefore the cleansing period could not be calculated from the date of discharge.  However, this guilty plea is prior to the guilty plea taken on April 3, 1988 (petitioner's Exhibit A), so it is obvious that not enough time elapsed for the cleansing period to occur between the two pleas.  The argument is thereby irrelevant.

Moreover these arguments are the same arguments raised by petitioner's counsel in her brief filed in the First Circuit under 2001-Ka-2548 on November 20, 2001.  Therefore, these issues have already been adjudicated.

Therefore, Claim #1 may be dismissed upon the pleadings under La. C.Cr.P. Art. 928 and 930.4.[35]

As an initial matter, this Court notes that the decision is incorrect to the extent that it holds that the issues were previously adjudicated on direct appeal.  On the contrary, the Louisiana First Circuit Court of Appeal found that the issues were not properly before that court and expressly held that petitioner should "seek review of his habitual offender status by means of application for post-conviction relief."[36]  Nevertheless, for the following reasons, the Court agrees with the state court's ultimate conclusion that petitioner is not entitled to relief.

---

[35] State Rec., Vol. VII of VIII, Order of Dismissal Without Answer dated October 9, 2002, p. 2.

[36] State v. Mallard, No. 2001-KA-2548, at p. 4 (La. App. 1st Cir. May 10, 2002) (unpublished); State Rec., Vol. VII of VIII.

Petitioner's first contention is that the state failed to prove he was represented by counsel with respect to his 1988 plea to the drug offense.  The burdens of proof in habitual offender proceedings are set forth in Louisiana law, which provides:

> Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact.  The presumption of regularity of judgment shall be sufficient to meet the original burden of proof.  If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information.  A copy of the response shall be served upon the prosecutor.  A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana and of the United States shall set forth his claim, and the factual basis therefor, with particularity in response to the information.  The person shall have the burden of proof, by a preponderance of the evidence, on any issue of fact raised by the response.  Any challenge to a previous conviction or adjudication of delinquency which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

La.Rev.Stat.Ann. § 15:529.1(D)(1)(b).  In the instant case, petitioner did not file a written response challenging the predicate conviction on the basis that he was unrepresented by counsel in violation of his constitutional rights.[37]  Additionally, he did not even object to the use of that conviction on that basis at the habitual offender hearing.  Accordingly, pursuant to § 15:529.1(D)(1)(b), the prior judgment of conviction was entitled to the presumption of regularity and was sufficient to meet the state's burden of proof.[38]

---

[37]  See State Rec., Vol. IV of VIII, transcript of October 9, 1996, p. 13.

[38]  Moreover, in any event, petitioner's implicit contention that the state must prove that he was represented in the prior proceeding for the resulting conviction to be used for enhancement purposes is incorrect.  As discussed at length later in this opinion, the state need only prove that petitioner effectively waived his right to counsel in that proceeding.  The transcript of the 1988 proceeding shows just such a waiver.  State Rec., Vol. VII of VIII, transcript of March 10, 1988, p. 6; see also

Petitioner's second contention is that the state failed to prove that the 1985 conviction fell within the applicable cleansing period.  However, that contention is contingent on his argument that the 1988 conviction could not be used against him for the reasons previously discussed; i.e. he is arguing that if *only* the 1985 conviction could be used, there was no evidence that the cleansing period had not expired between his discharge on the 1985 conviction and the current offense.[39]  For the reasons noted above, the Court finds that the use of the 1988 conviction was not improper. Therefore, petitioner's second contention necessarily fails.[40]

<u>Refusal of Plea</u>

Petitioner claims that the trial court improperly refused his request to plead guilty. The transcript reflects the following exchange which occurred during a break in the testimony of the first witness:

> BY MR. HARRIS [defense counsel]:
> If it please the Court, at this time I am Arthur Harris.  I represent Mr. Mallard.  We withdraw our former plea of not guilty and enter a plea of guilty as charged to the crime of possession of cocaine over four hundred grams and we enter this plea reserving our right to appeal the Motion To Suppress under Crosby.
>
> BY THE COURT:
> Please swear the defendant.

text accompanying *infra* note 49.

[39]  Rec. Doc. 1, supporting memorandum, p. 15.

[40]  Petitioner does not argue that the applicable cleansing period had not elapsed between the 1988 conviction and the current offense.  Under Louisiana law, as long as the cleansing period is met between the time petitioner was discharged on the immediately preceding conviction and the commission of the current offense, then all prior convictions may be used irrespective of the date of discharge on those other convictions.  <u>See</u> <u>State v. Everett</u>, 816 So.2d 1272 (La. 2002).

(DARREN R. MALLARD, AFTER HAVING BEEN FIRST DULY SWORN UNDER OATH, DID TESTIFY AS FOLLOWS:)

BY THE COURT:
    Have a seat, Mr. Mallard.

BY MR. MALLARD:
    One second before you do.  Can I address the Court for one second?

BY THE COURT:
    You may.

BY MR. MALLARD:
    If I may, I'm willing to do so, but if I may consult with my – I wanted to speak with my family before doing so.

BY THE COURT:
    Is your family here?

BY MR. MALLARD:
    My dad was trying to come.  He's in California.  I was going to explain to him there's no need to come and what I was getting ready to do.

BY THE COURT:
    We're going to continue the trial.  Bring in the jury.[41]

In rejecting petitioner's post-conviction claim that his rights were violated by the refusal to accept the plea, the state district court held:

> Petitioner claims that shortly after the trial began and immediately following a recess, he attempted to plead guilty to the crime as charged for a reduced sentence.  However, before pleading guilty, he wished to speak to his dad who was in California.  Upon hearing this attempt to continue the jury trial until his father could travel from California, the Court proceeding [sic] with the two-day trial.  Petitioner claims that he should have been allowed to proceed with his plea.

---

[41]  State Rec., Vol. III of VIII, transcript of March 14, 1996, pp. 266-67.

This argument is specious to the extreme.  Petitioner had months in which to arrange for his family to travel to Louisiana for the trial or to talk to them about the possibility of a plea.  And, in fact, if he was really serious about flying them in, he could have done so over the course of the two-day trial after it began.  And, if petitioner had wished to speak with his father on the telephone overnight, and then enter a guilty plea the next day of the trial, he could have done so.  This argument seems to be a thinly veiled attempt to achieve a continuance or a mistrial after a jury had already been seated.

Therefore, Claim #4 may be dismissed upon the pleadings under La. Cr. C. Art. 928.[42]

Petitioner contends that, pursuant to La. Code Crim. P. art. 560, he had a right to change his plea at any time.  There are two problems with his argument.

First, as is clear from the transcript, he was not actually ready to change his plea; rather, he wanted to first discuss the matter with his father, who was not present.  Article 560 does not by its terms apply to that scenario, which would effectively force a trial judge to halt proceedings in the midst of a jury trial to allow a criminal defendant to further deliberate with his family the advisability of possibly entering a guilty plea at some future time.  For petitioner's counsel to argue otherwise is simply ludicrous.

Second, even if article 560 were applicable, that would be of no moment in this federal proceeding.  As counsel should be aware, federal *habeas corpus* relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice.  28 U.S.C. § 2254; <u>Engle v. Issac</u>, 456 U.S. 107, 119 (1983).  It is well established a criminal defendant has no absolute right under *federal* law to have a trial judge accept a guilty

---

[42]  State Rec., Vol. VII of VIII, Order of Dismissal Without Answer dated October 9, 2002, pp. 3-4.

plea.  Santobello v. New York, 404 U.S. 257, 262 (1971); North Carolina v. Alford, 400 U.S. 25,

38 n.11 (1970); Lynch v. Overholser, 369 U.S. 705, 719 (1962).

Brady Claim

Petitioner argues that the trial court erred in failing to properly address his Brady[43]

claim.  Petitioner asserted his Brady claim in his second state post-conviction application.  In the

last reasoned state court judgment addressing the claim, the state district court rejected the claim,

holding:

> Petitioner claims that because physical surveillance logs discovered from the Office of the District Attorney revealed that he had been under surveillance by the F.B.I. and because he was unable to attack the credibility of Trooper Saizan upon the reasons for the stop, that he had been denied Brady material which would have helped his defense (Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963)).  Exactly what this Brady material is which would have provided a defense is not clear from the memorandum.
>
> In any case, the long discussion concerning the validity of the traffic stop by Trooper Saizan has already been discussed at some length and rejected in a previous appeal by petitioner to the First Circuit (See Judgment of February 20, 1998, Docket No. 97-KA-0337, pp. 9-11).  In that Judgment, the appellate court concluded that there was probable cause for the traffic stop and the ensuing investigation, resulting [sic] the arrests of the automobile's occupants.
>
> Therefore, Claim #5 may be dismissed on the grounds of La. Cr. C. P. Art. 930.4.[44]

---

[43]  See Brady v. Maryland, 373 U.S. 83 (1963).

[44]  State Rec., Vol. VII of VIII, Order of Dismissal Without Answer dated October 9, 2002, p. 4.  In the judgment referenced by the trial judge, the Louisiana First Circuit Court of Appeal had held, in pertinent part:

> The distinction between an arrest and an investigatory stop is crucial in many cases, for an arrest can be made only on probable cause, while a stop is proper under the more relaxed, "reasonable

- 20 -

suspicion" standard of **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  **State v. Flowers**, 441 So.2d 707, 713 (La. 1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984).  An arrest occurs when circumstances indicate an intent to effect an extended restraint on the liberty of an accused, rather than at the precise time an officer tells an accused he is under arrest.  **State v. Commodore**, 418 S.2d 1330, 1333 (La. 1982).  However, an investigatory stop is a complete restriction on liberty of movement for a time.  A stopping for investigation is not a lesser intrusion because the restriction of movement is incomplete but, rather, because it is briefer than an arrest.  **State v. Vincelli**, 555 So.2d 21, 24 (La. App. 1ˢᵗ Cir. 1989).  It is the circumstances of each case which determine the nature of the detention.  **State v. Borning**, 477 So.2d 134, 139 (La. App. 1ˢᵗ Cir. 1985), writ denied, sub nom. **Borning v. Louisiana**, 481 So.2d 1330 (La.), cert. denied, 479 U.S. 988, 107 S.Ct. 582, 93 L.Ed.2d 584 (1986).

La. Code Crim. P. art. 215.1 authorizes a law enforcement officer to make an investigatory stop when he "reasonably suspects" that a person is committing, has committed, or is about to commit an offense.  An officer has the right to stop an individual and to demand his name, address, and an explanation of his actions and the right to detain the person temporarily to verify information given or to obtain information independently of his cooperation.  **State v. Fauria**, 393 So.2d 688, 690 (La. 1981); **State v. Vincelli**, 555 So.2d at 24.  An officer may order the passengers to exit a vehicle during a routine traffic stop, although only the driver has committed an offense.  **Maryland v. Wilson**, ___ U.S. ___, ___, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997).

The determination of the existence (or lack thereof) of probable cause is a substantive determination to be made by the trial court from the facts and circumstances of the case.  The trial court's conclusions as to the existence of probable cause are entitled to great weight.  **State v. Garcia**, 519 So.2d 788, 793 (La. App. 1ˢᵗ Cir. 1987), writ denied, sub nom. **State v. Rodriquez**, 530 So.2d 85 (La. 1988).

In **United States v. Sharpe**, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), the Supreme Court recognized that an investigatory stop which continues indefinitely will at some point no longer be justified as an investigatory stop.  However, according to **Sharpe**, as much as a "bright line" rule would be desirable in evaluating the reasonableness of an investigative detention, common sense and ordinary human experience must

- 21 -

govern over rigid criteria.  In reviewing the length of a detention, it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.  **United States v. Sharpe**, 470 U.S. at 686, 105 S.Ct. at 1575; **State v. Vincelli**, 555 So.2d at 25; **State v. Borning**, 477 So.2d at 139.

Because Quinney committed violations of La. R.S. 32:301 and 304, Trooper Saizan clearly had the right to stop the vehicle driven by Quinney and interrogate him in accordance with La. Code Crim. P. art. 215.1.  The record shows that Saizan did not have any suspicions about Quinney and the passengers until after the stop when Quinney and the passengers, including the defendant, could not tell him owned the vehicle and gave conflicting, inconsistent stories.  Saizan was justified in inquiring about the actions of Quinney and the passengers.  Thus, his questioning of Quinney, the defendant, and the other passengers of the vehicle was clearly within the scope of La. Code Crim. P. art. 215.1.

Following the lawful stop of the vehicle driven by Quiney, the police then pursued a means of investigation likely to confirm or dispel their suspicions quickly by summoning to the scene a drug-certified dog.  **United States v. Sharpe**, 470 U.S. at 686, 105 S.Ct. at 1575.  The dog arrived within forty minutes of the stop and alerted on the tailgate of the vehicle, giving the officers probable cause to search the vehicle.  Cf.  **United States v. Place**, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).  Exigent circumstances arising from the stop of a vehicle on the open road excused the warrant requirement.  See **State v. Edsall**, 385  So.2d 207 (La. 1980); **State v. Gant**, 93-2895 (La. 5/20/94), 637 So.2d 396, 397.  Furthermore, a "canine sniff" by a well-trained narcotics detection dog does not constitute a search within the meaning of the Fourth Amendment.  **United States v. Place**, 462 U.S. at 707, 103 S.Ct. at 2644-45; **State v. Arrington**, 556 So.2d 263, 265 (La. App. 2d Cir. 1990).

The defendant also acknowledges that only thirty-eight minutes passed between the initial stop and until probable cause for a search was established.  Additionally, Saizan told Quinney, that he, the defendant, and the others were free to leave but the vehicle would have to remain.  Saizan testified that he or one of the other officers would have given them a ride to a telephone or wherever they needed to go.  During the thirty-eight minutes, Saizan interviewed Quinney and the passengers, tried to secure consent to search the vehicle, and waited on the narcotics dog.  The original stop was justified by the

- 22 -

"Whether documents must be produced and whether they are material under <u>Brady</u> is a mixed question of law and fact." <u>Trevino v. Johnson</u>, 168 F.3d 173, 184 (5th Cir. 1999). Therefore, this Court is required to defer to the state court's decision rejecting petitioner's <u>Brady</u> claim unless the decision "was contrary to, or involved an unreasonable application of, clearly

---

traffic violations and actions of the driver and passengers (including appearing nervous, giving conflicting and inconsistent stories, and the fact that no one knew who owned the car) gave Saizan reasonable suspicion to believe the occupants were committing, had committed, or were about to commit an offense.  The thirty-eight minute delay from the initial stop until the drug dog alerted on the tailgate of the vehicle was not sufficient to be construed as an undue restraint on the defendant's liberty, especially in light of the fact that Saizan advised the occupants of the vehicle that they were free to leave but the vehicle would have to be detained.  Saizan diligently pursued a means of investigation likely to quickly confirm or dispel his suspicions.  The officers only searched the interior of the vehicle after the dog alerted to the rear of the vehicle.  Thus, pursuant to the facts of the instant case, we find that the officers used reasonable diligence in investigating their suspicions against the defendant.

Considering the above, we find that the officers had probable cause to stop and then search the vehicle.  The warrantless search was justified as there were exigent circumstances because the drugs were located in a car.  <u>See</u> **Chambers v. Maroney**, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).  The conflicting stories of the vehicle's driver and its passengers, combined with their nervousness, evasive answers, and inability to tell Saizan who owned the car and the narcotics dog alerting the officers to the presence of drugs, certainly gave the officers probable cause to search the vehicle.  Therefore, an immediate warrantless search for that contraband was constitutionally permissible.  **State v. Garcia**, 519 So.2d at 794.  The occupants of the vehicle were not placed under arrest until the officers found the package to which the dog alerted.

State v. Mallard, No. 97-KA-0337, pp. 8-12 (La. App. 1st Cir. Feb. 20, 1998) (unpublished); State Rec., Vol. V of VIII.

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §

2254(d)(1).

> Regarding Brady claims, the United States Fifth Circuit Court of Appeals has stated:
>
>> Brady requires the state to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
>>      Under Brady, to establish that the state has breached this duty, the defendant must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment.   This duty extends to both exculpatory and impeachment evidence.

DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002) (internal quotation marks and citations

omitted).

> Regarding the materiality requirement, the Fifth Circuit has noted:
>
>> Evidence is *material* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; and such reasonable probability is a probability sufficient to undermine confidence in the outcome.

Martin v. Cain, 246 F.3d 471, 477 (5th Cir. 2001) (internal quotation marks and brackets omitted).

As an initial matter, this Court notes that petitioner's *habeas* counsel does not offer

any evidence, such as an affidavit from trial counsel, that the surveillance logs were in fact withheld.

Such an omission of any evidence on the initial prong of the Brady inquiry is, in and of itself, fatal.

See Harris v. United States, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not

bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove

that the government failed to disclose evidence favorable to [him].), aff'd, 216 F.3d 1072 (2nd Cir.

2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir. 1998); Cruz v. Artuz, 97-CV-

2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).

Moreover, the record would indicate that no information was in fact withheld from the defense.  At trial, Assistant District Attorney Ronald T. Gracianette stated that petitioner's trial counsel, Arthur L. Harris, had been "given open file discovery, which includes access to every piece of information and document in [the District Attorney's] file ...."[45]  Harris did not dispute that fact. Additionally, the fact that petitioner had been under surveillance by federal authorities in California was certainly not a secret hidden from the defense; on the contrary, one of the federal agents involved in the surveillance, Stanley Suenga, even testified at petitioner's trial.[46]  If Harris had wanted to question Suenga regarding the extent of that surveillance or question Saizan regarding whether he was aware of the federal investigation, he certainly could have done so.

Additionally, in any event, this Court agrees with the state court's assessment that the surveillance logs simply do not rise to the level of Brady material.  Petitioner, understandably, does not even now contend that the logs were in any way exculpatory; clearly, they were not. Rather, he casts the logs as evidence which could have been used to impeach Saizan regarding his motive for making the stop.  Petitioner essentially argues that Saizan surely must have been aware of the California surveillance. However, there is absolutely no evidence whatsoever to support that bald speculation, or even any basis for believing that Saizan, a Louisiana state trooper, would have any knowledge of the surveillance operation conducted by federal authorities in California.

In light of the foregoing, there is nothing to support petitioner's theory that Saizan had knowledge of the California surveillance or that it was that knowledge which formed the

---

[45] State Rec., Vol. III of VIII, transcript of March 14, 1996, p. 230.

[46] State Rec., Vol. III of VIII, transcript of March 15, 1996, pp. 94-97.

impetus for the traffic stop.  There is simply nothing to suggest that Saizan had any motivation for stopping the vehicle other than the reason he has consistently stated, i.e. that the vehicle had a broken taillight.  Even if defense counsel had in his possession the logs regarding the federal surveillance conducted in California and was able to question Saizan concerning what knowledge, if any, he had of that surveillance, there is no reasonable probability that the result of the proceeding would have been different.

Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's Brady claim.

Ineffective Assistance of Counsel

Petitioner contends that both his trial counsel and appellate counsel were ineffective. In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  See id. at 697.  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Id.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).

Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether the petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  In order to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. Briesno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, petitioner must demonstrate a reasonable probability that if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briesno, 274 F.3d at 210.

A claim of ineffective assistance of counsel is a mixed question of law and fact. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must defer to the state court on such claims unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Petitioner argues that his trial counsel was ineffective in failing (1) to challenge the predicate offenses used in the habitual offender proceedings, (2) to adequately cross-examine Trooper Saizan, (3) to specifically argue in the motion to suppress that petitioner's detention constituted an unconstitutional seizure of his person, and (4) to enforce a plea bargain. He further contends that his appellate counsel was ineffective in failing to assign as error the insufficiency of the evidence to support the conviction and the habitual offender adjudication and to specifically argue that petitioner's detention constituted an unreasonable seizure of his person.

Petitioner asserted his ineffective assistance of counsel claims in his second state post-conviction application. In rejecting the claims, the state district court held:

> A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that his attorney was ineffective, petitioner must first show that the attorney's performance was deficient, which requires a showing that counsel made errors so serious that he/she was not functioning as counsel guaranteed by the Sixth Amendment. Secondly, the petitioner must prove that the deficient performance prejudiced the defense. This element requires a showing that the errors were so serious that petitioner was deprived of a fair trial; the petitioner must prove actual prejudice before relief will be granted. It is not sufficient for petitioner to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that but for the counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have

been different.  Further it is unnecessary to address the issues of both counsel's performance and prejudice to petitioner if the petitioner makes an inadequate showing on one of the components.  <u>State v. Serigny</u>, 610 So. 2d 857, 859-60 (La. App. 1 Cir. 1992); writ den. 614 So.2d 1263 (La. 1993).

This Court has reviewed the transcripts of both counsel, the trial attorney Arthur Harris of New Orleans and appellate attorney Kathryn Flynn Simino of Baton Rouge, and has found them to be more than adequate in their representation of the petitioner.

Therefore, Claims #2 and #3 may be dismissed upon the pleadings under La. C.Cr.P. Art. 928.[47]

As noted, petitioner contends that his counsel was ineffective in numerous respects. The Court will address each of petitioner's contentions.

First, petitioner argues that his trial counsel was ineffective in failing to challenge the predicate convictions used in the habitual offender proceedings.  For the following reasons, the Court rejects that claim.

With respect to the 1988 conviction, petitioner contends that his counsel should have challenged that conviction on the ground that he was unrepresented by counsel.  The flaw with that contention is its underlying premise that an uncounseled predicate plea cannot be used to enhance a habitual offender sentence under Louisiana law.  That is simply incorrect.

It is true that in <u>State v. Shelton</u>, 621 So.2d 769 (La. 1993), the Louisiana Supreme Court stated:

If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas *and that defendant was represented by counsel when they were taken.* If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his

---

[47] State Rec., Vol. VII of VIII, Order of Dismissal Without Answer dated October 9, 2002, p. 3.

> rights or a procedural irregularity in the taking of the plea.  If the
> defendant is able to do this, then the burden of proving the
> constitutionality of the plea shifts to the State.

Id. at 779-80 (footnote omitted) (emphasis added).  The Louisiana Supreme Court subsequently

adopted an identical procedure for proving predicate convictions with respect to recidivist D.W.I.

prosecutions.  State v. Carlos, 738 So.2d 556, 559 (La. 1999).  However, the Louisiana Supreme

Court later made clear that Shelton and Carlos, which both involved defendants who *were*

represented by counsel at the time they entered their guilty pleas in their predicate convictions,

should not be read to mean that uncounseled guilty pleas cannot serve as predicate convictions to

enhance subsequent sentences.  State v. Deville, 879 So.2d 689 (La. 2004).  When the predicate

conviction involves an uncounseled guilty plea, then the state, as part of its initial burden in habitual

offender proceedings, must simply show that the defendant waived counsel.  State v. Wise, 905

So.2d 387, 390 (La. App. 5th Cir. 2005); State v. Perez, 895 So.2d 50, 53 (La. App. 5th Cir. 2005).

The transcript from the 1988 proceeding clearly reflects that petitioner waived his

right to counsel in that proceeding.  At the that proceeding, the prosecutor explained petitioner's

rights on the record,[48] and he affirmatively waived those rights, including the right to counsel:

> MS. SCHWARTZ:  OKAY.  YOU ALSO HAVE A RIGHT
> TO AN ATTORNEY, WHICH YOU HAD EARLIER INDICATED
> YOU DID NOT WANT.
> BY PLEADING NO CONTEST HERE BY YOURSELF
> YOU'LL BE GIVING UP THAT RIGHT.
> DO YOU UNDERSTAND THAT?

---

[48]  At one point in the petition, *habeas* counsel implies that it was improper for the prosecutor,
rather than the judge himself, to do the advisement of rights.  Rec. Doc. 1, supporting memorandum,
p. 15.  That is incorrect; the Constitution does not require that the advisement of rights come from
the judge.  See, e.g., Brown v. Jernigan, 622 F.2d 914, 915-16 (5th Cir. 1980).

THE DEFENDANT:  YES.

MS. SCHWARTZ:  IS THAT WHAT YOU WANT TO DO?

THE DEFENDANT:  YES.[49]

The trial court then found that petitioner had properly waived his rights.[50]

With respect to the 1985 conviction, petitioner contends that his counsel should have challenged that conviction on the ground petitioner was not adequately informed of his right against self-incrimination.  That contention is utterly meritless.  Petitioner was represented by attorney, R.W. McMillan, in the 1985 proceeding.  Moreover, during the plea colloquy, he was expressly informed  of his right against self-incrimination, and he expressly stated that he understood and wanted to waive that right:

> THE COURT:  Mr. Franklin, you have the right to a jury trial, the right to be confronted by and to cross-examine the witnesses at your trial; the right to have witnesses subpoenaed for your side of the case free of charge by the Court and the right against self-incrimination.
> Do you understand those rights?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Do you have any questions about them?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:  Do you want to give them up so I can accept your plea?
>
> THE DEFENDANT:  Yes.

---

[49]  State Rec., Vol. VII of VIII, transcript of March 10, 1988, p. 6.

[50]  State Rec., Vol. VII of VIII, transcript of March 10, 1988, p. 7.

THE COURT:  Do you join?

MR. MCMILLAN:  Join.[51]

For the foregoing reasons, the proposed challenges to the predicate convictions had no merit.  Accordingly, petitioner's counsel cannot be deemed deficient for failing to assert them. See, e.g., Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

Second, petitioner argues that his trial counsel was ineffective in failing to adequately cross-examine Trooper Saizan.  As he does in connection with his Brady claim, petitioner again opines that Saizan surely must have been aware of the California surveillance, and petitioner now argues that his counsel should have aggressively cross-examined Saizan on that point.

---

[51]  State Rec., Vol. VII of VIII, transcript of December 13, 1985, pp. 2-3.  Petitioner is referred to in that proceeding as "Darren Franklin," another name he uses.

Moreover, to the extent that petitioner is contending that the trial judge was required to provide a lengthy explanation of the parameters of the right against self-incrimination, such a tutorial is not constitutionally required.  The United States Fifth Circuit Court of Appeals has noted:

> The United States Supreme Court has held that a guilty plea involves the waiver of several federal constitutional rights including the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers.  Boykin v. Alabama, [395 U.S. 238 (1969)].  Because the guilty plea involves a waiver of constitutional rights, entry of the plea must be intelligent and voluntary.  This Circuit has repeatedly held that a specific express articulation and waiver of the three rights mentioned in Boykin is *not* mandated, but that it is necessary for the record to show that the plea was voluntarily and intelligently given.

Neyland v. Blackburn, 785 F.2d 1283, 1287 (5th Cir. 1986) (emphasis in original; citations omitted).  From reading the colloquy transcript in its entirety, it is evident that petitioner's guilty plea, entered with benefit of counsel, was voluntarily and intelligently given.

Case 2:04-cv-01437-CJB   Document 10   Filed 05/11/06   Page 33 of 37

"The decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F.Supp.2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005), cert. denied, 125 S.Ct. 1026 (2006).  The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.  Such second-guessing is especially inappropriate in the instant case for the following reasons.

As a preliminary matter, petitioner's *habeas* counsel again offers nothing more than rank speculation that Saizan, a Louisiana state trooper, had any knowledge whatsoever of the surveillance operation conducted by federal authorities in California or that such knowledge formed the impetus for the traffic stop.  There is simply nothing to suggest that Saizan had any motivation for stopping the vehicle other than the reason he has consistently stated, i.e. that the vehicle had a broken taillight.  There is no reason to believe that he would have admitted anything different under vigorous cross-examination on that point.

Additionally, such vigorous cross-examination would have simply highlighted the fact that petitioner was the subject of the federal investigation in California, information that counsel understandably wanted to keep from the jury because of the obvious implication that petitioner was involved in other crimes.[52]  Clearly, counsel cannot be found deficient in avoiding a line of cross-

---

[52]  See State Rec., Vol. III of VIII, transcript of March 15, 1996, pp. 96-97.

- 33 -

examination that was unlikely to produce an admission from Saizan and would instead result only in implications prejudicial to the defense.

Third, petitioner argues that his trial counsel was ineffective in failing to specifically argue in the motion to suppress that petitioner's detention constituted an unconstitutional seizure of his person.  However, on direct appeal, the Louisiana First Circuit Court of Appeal exhaustively examined the circumstances and legal implications of the traffic stop, questioning, and detention of the vehicle's occupants and found nothing improper.[53]  Generally, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial."  Stone v. Powell, 428 U.S. 465, 494 (1976) (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002).  It is true that the Stone restriction does not extend to "Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue." Kimmelman v. Morrison, 477 U.S. 365, 382-83 (1986).  Nevertheless, such a Sixth Amendment claim requires at its foundation a *meritorious* Fourth Amendment issue.  Id. at 375, 382.  For the reasons set forth by the state court, petitioner's underlying Fourth Amendment issue is not meritorious.  Therefore, his derivative ineffective assistance of counsel claim necessarily fails.

Fourth, petitioner argues that his trial counsel was ineffective in failing to enforce a plea bargain agreement.  Petitioner's *habeas* counsel, who is responsible for carrying the burden of proof with respect to this claim, has presented no evidence whatsoever, such as an affidavit from

---

[53]  State v. Mallard, No. 97-KA-0337, pp. 7-12 (La. App. 1st Cir. Feb. 20, 1998) (unpublished); State Rec., Vol. V of VIII; see also *supra* note 44.

petitioner's trial counsel, the prosecutor, or a third party with direct knowledge of the issue, that the state ever offered a plea bargain, much less that the offer remained in effect at the time of trial. Accordingly, petitioner cannot establish that his counsel was ineffective in failing to enforce such a plea bargain.

Fifth, petitioner argues that his appellate counsel was ineffective in failing to assign as error the insufficiency of the evidence to support the conviction and the habitual offender adjudication. For the following reasons, those contentions have no merit.

To the extent that petitioner's *habeas* counsel is contending that there was insufficient evidence to support the conviction for possession of over four hundred grams of cocaine, that contention is ludicrous. Police recovered from the vehicle a package bearing petitioner's fingerprints and containing a total of 798.8 grams of cocaine. That evidence was more than sufficient to support petitioner's conviction. Therefore, clearly appellate counsel did not perform deficiently in failing to raise a meritless sufficiency of the evidence claim. As the United States Supreme Court has noted, "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." Id. at 753. That maxim applies with even more force when, as here, the complaint is that a *patently frivolous* claim was not raised.

Petitioner also claims that his appellate counsel was ineffective in failing to challenge the sufficiency of the evidence to support his habitual offender adjudication for the reasons

previously discussed in his first federal claim.  However, for the reasons this Court previously set forth in rejecting that claim, any appellate challenge to the sufficiency of the evidence would have been meritless.  Again, appellate counsel cannot be deemed to have performed deficiently in failing to assert a meritless claim.

Lastly, petitioner contends that appellate counsel was ineffective in failing to specifically argue that petitioner's detention constituted an unreasonable seizure of his person.  For the same reasons that this Court rejected the contention that trial counsel was ineffective in that regard, this related claim that appellate counsel was similarly ineffective is likewise rejected.

In the instant case, the state court correctly identified the appropriate legal standard, i.e. the Strickland  standard, in analyzing petitioner's ineffective assistance of counsel claims.  Moreover, petitioner has failed to demonstrate that the state court's decision on any of his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court therefore rejects those claims.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Darren Mallard be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)

(en banc).

New Orleans, Louisiana, this eleventh day of May, 2006.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**